23 N.Y.2d 202 (1968)
In the Matter of Camphill Village, U.S.A., Inc., Appellant,
v.
Workmen's Compensation Board, Respondent.
Court of Appeals of the State of New York.
Argued October 9, 1968.
Decided November 21, 1968.
Abraham Wilkenfeld for appellant.
Louis J. Lefkowitz, Attorney-General (Henriette Frieder, Ruth Kessler Toch and Daniel Polansky of counsel), for respondent.
Judges BURKE, SCILEPPI and JASEN concur with Judge BREITEL; Judge BERGAN dissents and votes to affirm in a separate opinion in which Chief Judge FULD and Judge KEATING concur.
*203 BREITEL, J.
The issue is whether appellant corporation (Camphill) is a covered employer under the Disability Benefits Law (Workmen's Compensation Law, §§ 200-242) and, therefore, obliged to satisfy the statutory insurance requirements. It has been so determined by the Workmen's Compensation Board and the determination has been unanimously confirmed, with a memorandum decision, by the Appellate Division. Camphill contends that the undisputed evidence shows that it is a charitable corporation, whose coworkers are not employees, but volunteers, and that, therefore, the coworkers are expressly exempted from coverage by the statute.
*204 The question thus presented is exclusively one of law; if the evidence does not provide any basis for the board determination it must be annulled. No issue of fact is presented, either by contradiction or permissible contrary inferences of fact. Because the undisputed evidence does not permit the inference that coworkers were employees in the statutory sense, it is concluded that the order of the Appellate Division should be reversed and the board determination annulled.
Camphill is a New York, tax-exempt, nonprofit membership corporation organized to house, train, and rehabilitate mentally handicapped persons aged 16 years and over. Its incorporation was approved by the State Board of Social Welfare and its activities are licensed and supervised by the State Department of Mental Hygiene. It raises its funds primarily by private tax-exempt charitable contributions. Additionally, some of its income is derived from fixed fees paid on behalf of those whom it assists, and something less than 10% of its income is derived from sales of products made by its residents.
The "Camphill movement", which originated from the teachings of one Rudolf Steiner, an Austrian, has counterparts in the United Kingdom, the European continent, and Africa. The New York corporation was organized in 1961, at about which time the village community was established in Copake, Columbia County. This community now has in the neighborhood of 31 villagers (the mentally handicapped residents) and 14 coworkers. The coworkers are normal adults who agree to live in and supervise, as separate households in separate buildings, family-like establishments in the village. The object is to train, house, and provide "warm" surroundings for the mentally handicapped by having them live and work with the coworkers and the coworkers' families. The villagers and coworkers together engage in gardening, farming, dairying, simple carpentry, baking, maintenance, and repair in the community, economically productive crafts, and pursuits with artistic or recreational ends.
The coworkers receive no stipulated compensation and are free to terminate the relationship at any time. They receive full subsistence for their households, including the mentally handicapped villagers, and they also use village funds for recreational and cultural pursuits. The funds are allocated *205 to each household in roughly the amount of $600 for each month, out of which the coworkers make discretionary disbursements for the subsistence and other needs of the entire household. Extraordinary expenses are taken care of as they may arise, as are all medical and dental expenses. The allocation of sums either to the households or within any household does not depend on the work done or on any given assignments of work but is based on needs, within the standards or levels of the community.
A number of coworkers come from abroad where they had been especially trained for their work. Some of these testified that their transfer from abroad was voluntary and that, as a matter of conscience, replacements abroad were arranged before they travelled to their new assignments in this country.
The coworkers are not supervised but use their discretion in satisfying the community standards for the operation of the households and care of the villagers. While there is an executive director, he receives no additional benefits or sums for his work and he disclaimed that he was a superior or manager of the others. Instead, problems are worked out by discussion and consensus among affected groups or the whole community.
All of the testimony uniformly indicated, and the Referee found as a fact, that the coworkers' attachment to the community was motivated by dedication to the helping of others in need rather than by any career or economic purpose.
Particularly significant is that the allowances provide subsistence for the entire household unit, villagers and coworkers included, and are based on the size and needs of the unit.
Camphill contends that its workers are not covered employees under the Disability Benefits Law since they are "volunteers in and for a religious, charitable or educational institution" and, therefore, excluded from coverage (§ 201, subd. 5). A "volunteer", however, is nowhere defined by statute, nor otherwise differentiated from the statutory definition of "employee"  that is, "person engaged in the service of an employer" (§ 201, subd. 5). The board would distinguish between the two groups on the basis of whether or not wages are paid. Camphill does not dispute this basis for distinction. Although there is no explicit statutory authorization for this standard, it conforms to the common understanding that volunteers, as distinguished from employees, are those who do not *206 get paid for their work. Thus, the statutory definition of "wages", that is "the money rate at which employment with a covered employer is recompensed under the contract of hiring" (§ 201, subd. 12), is an appropriate test for differentiating between volunteers and employees.
The board correctly argues that neither a formal hiring agreement nor the payment of money is required for a finding that there is an employment and that wages have been paid (Matter of Hall v. Salvation Army, 261 N.Y. 110; Matter of Bernstein v. Beth Israel Hosp., 236 N.Y. 268; Matter of Boehm v. Sokol Hall Holding Corp., 274 App. Div. 954). But what is necessary is a finding that there is indeed a legal contract of hire under which the worker obtains benefits as recompense for services rendered (§ 201, subd. 12; see, generally, 1A Larson, Workmen's Compensation Law, § 47.41).
The evidence established that the coworkers at Camphill do not receive subsistence as recompense for their services, but simply to enable them to carry out their work. The allowances and subsistence are necessary as a condition for the coworkers to perform their services at the times and places required; but they are hardly, on the undisputed evidence, a bargained consideration or quid pro quo for services rendered. The communal living arrangements, although incidentally a means of supplying the coworkers with needs for which they would otherwise have to pay, are a necessary condition for the kind of services they render, and, in fact, are actually the means by which the services are rendered. They, therefore, do not attain the status of employees merely because the allowances and subsistence are provided.
To be sure, wages in a proper case may include subsistence. Indeed, the statute defines wages to include "the reasonable value of board, rent, housing, lodging, or similar advantage received under the contract of hiring" (§ 201, subd. 12). On the other hand, there may be those who give of their services without compensation and are, therefore, volunteers, although they may at the same time receive housing, food, or other subsistence in order to enable them to serve (Enderby v. Industrial Comm., 12 Wis. 2d 91; Hall v. State Compensation Ins. Fund, 154 Col. 47; see, generally, 1A Larson, Workmen's Compensation Law, § 47.42, and cases cited).
*207 Thus, it has been held that where subsistence payments do not rest upon an obligation to render services, there is no contract of hire and no employer-employee relationship (Matter of Seymour v. Odd Fellows' Home, 267 N.Y. 354, 356). As already observed, the household unit allowances provide subsistence for the entire household, villagers and coworkers included, and are based on the size and needs of the units rather than the output of services or products. Moreover, apportionment of the allowances and subsistence within the households bears no relationship to the services rendered, but relates solely to the needs of the individuals.
The amount of allowances provided is also significant. The undisputed evidence showed that the equivalent value of the average coworker's allowance, including subsistence, is approximately $30 per week. This minimal allowance further supports the view that the coworkers are not engaged in Camphill activities for any career or economic purpose in the usual sense, but accept subsistence because they would otherwise be unable to render the services (cf. Matter of Bernstein v. Beth Israel Hosp., 236 N.Y. 268, supra). Of course, Camphill and its coworkers may not determine the legal nature of their relationship simply by characterizing it as voluntary and not for economic gain (cf. Matter of Electrolux Corp., 288 N.Y. 440, 444). However, there is not the slightest suggestion in the record, nor does the board ever contend, that any subterfuge is involved. Indeed, the board does not argue that the coworkers are motivated by any considerations other than dedication to the humanc tasks upon which they are engaged. This is not to say that low wages or humane motivations can convert an employment into a voluntary arrangement. But in the context of this enterprise, as established by the instant record, these are strong indicia that the subsistence is not being given or received as recompense.
The subsistence, on all of the factors revealed, is then only a condition for rendering the services and not a bargained consideration or a recompense for them.
Finally, the Disability Benefits Law prior to 1960 exempted from mandatory coverage the nonprofitmaking activities of charitable institutions (L. 1956, ch. 204). The wider mandatory coverage of workers for these institutions, after 1960, was obviously intended to be limited, since the "volunteer" exception *208 was added at the same time (L. 1960, ch. 791). If there is any wisdom in excluding volunteers who receive subsistence from the "volunteer" exception, as in the case of Camphill, the proper remedy is appropriate legislation such as that which in 1956 covered services by employees in connection with the profitmaking enterprises of charitable institutions (see L. 1956, ch. 204). That is much the better way than straining the statutory nomenclature and ignoring the realities of the relationship in Camphill to require coverage for volunteers whose subsistence bears no correlation to the nature or quantity of services rendered and is received under circumstances which forbid the inference that it is in consideration for those services.
The evident purpose of the statute is to except, as volunteers, charitable workers who dedicate themselves to humane work without expectation of economic gain or benefits in the ordinary or commonly accepted sense. Indeed, if charity workers receiving some subsistence are not included in the exception of "volunteers" it is difficult to think of any who are covered by the exception, since charity workers who receive no subsistence nor any moneys at all create no problem requiring the statutory exception. Consequently, on the facts disclosed, the absence of any contradiction of the evidentiary facts, and the absence of any contradiction of the asserted purposes of the activities involved or of the motivations of the coworkers engaged in such activities, the coworkers are not covered employees.
Accordingly, the order of the Appellate Division should be reversed, with costs in this court and in the Appellate Division, and the determination of the Workmen's Compensation Board annulled.
BERGAN, J. (dissenting).
In approving the bill which, in 1949, for the first time established disability benefits as an extension of workmen's compensation, Governor Dewey regarded it as progressive legislation "to give", as the Governor noted, "men and women * * * the benefits of social insurance against the hazards of sickness and disability not incurred in their employment" (cf. dissenting opn., FULD, J., in Matter of Knapp v. Syracuse Univ., 308 N.Y. 274, 278).
A reversal of the decision of the Workmen's Compensation Board and of the Appellate Division to hold, as a matter of *209 law, the "co-workers" were not "employees" of appellant corporation would bring about the result that, although the appellant regards them as being employees entitled to workmen's compensation coverage which it provides for injury sustained arising "in the course of employment", they are not "employees" for the additional benefits arising from sickness or injury not directly attributable to the same "employment".
Although there is no exception as to workmen's compensation itself for "volunteers", still the basic problem here is whether or not there was employment and that is essentially the same problem in workmen's compensation and disability benefits.
Indeed, until it permitted its policy to lapse for failure to pay the premium, the appellant corporation itself had recognized the need to cover its "co-workers" for disability benefits as well as for workmen's compensation.
Although it has a considerable income, appellant is a charitable corporation and the critical problem in the case is whether the "co-workers" who carry out the corporation's functions are within the direction of the statute excepting "volunteers" from the term "employee", as defined in subdivision 5 of section 201 of the Workmen's Compensation Law.
The expression "volunteer" is not itself defined in the statute or in the rules and regulations promulgated by the Workmen's Compensation Board. It must be left, then, for such general aids to definition as may be available. The expression "volunteer" would usually be thought to embrace, for example, people who give parttime service to a hospital or a church without any remuneration or with entirely incommensurable return. It would usually not be thought to embrace a total subsistency of the worker, especially if the definitive scope of "wages" in the statute (Workmen's Compensation Law, § 201, subd. 12) be read in context.
The appellant itself proffers as a definition of "volunteer" this: "One who enters into the service of his own free will, one who gives his services without any express or implied promise of remuneration."
Yet, if this definition be taken, and it seems good enough on its face, the relationship of the volunteers to the corporation as developed in the present record cannot be held as a matter *210 of law to be of such a nature as to be excluded with certainty from the term "employee".
It presents, rather, on this record an open question of fact as to just what this highly specialized relation between the corporation and its coworkers means in actual practice squared against the measure and intent of the statute.
If the nature of the relationship is arguable, one way or the other, a decisive point of law is not presented. The difficulties this court is having with the problem and views of the Referee, the Workmen's Compensation Board and the Appellate Division, all together suggest that the relationship is not so simply and clearly laid out as to be readily susceptible of a certain resolution as a matter of law.
Portions of the majority opinion come extremely close to making a fact judgment, i.e., "[t]he evidence established that the coworkers at Camphill do not receive subsistence as recompense for their services, but simply to enable them to carry out their work" (p. 206). The "evidence established" this conclusion in a debatable situation only if a fact-finder accepted it.
It seems fairly close to fact-finding against the tenor of findings by the Referee and the board the other way to say, as the majority does: "But in the context of this enterprise, as established by the instant record, these are strong indicia that the subsistence is not being given or received as recompense. The subsistence, on all of the factors revealed, is then only a condition for rendering the services and not a bargained consideration or a recompense for them" (p. 207).
The record is neither as conclusive nor as indisputable as this language would suggest. On the contrary, it is arguable; and this means the basic value judgment on how the parties (the corporation and its volunteers) acted toward each other should be left with the board.
The appellant's corporate charter, in reciting its nonprofit purpose, makes express provision, nevertheless, for the payment of "remuneration" to any employee.
The corporation's official pamphlet, distributed to the public, states that a part of the "current expenses" is "the complete upkeep" of the coworkers.
*211 The implementation of this becomes clear when reference is made to the written agreement with the corporation made by each coworker addressed to "The Officers and Board Members", that in "serving" as "a volunteer", "I * * * expect and will be satisfied to receive the perquisites[1] furnished to co-workers".
This expressly expected benefit from "service" (the "perquisites") fulfills the usual criteria of an employment contract since nobody contends that total subsistence could not be regarded as compensation, if there be employment, and that which is received is part of the reason for the service.
It gets down, then, to whether the total support given is any part of the basis for the service and it can scarcely be doubted that the term "expect" and the term "will be satisfied to receive" could be treated by the board factually as indicating a true employment relation.
The proof in the record, aside from the documents offered by the corporation, certainly does not take the "co-workers" clearly out of an employment relation; rather, it leaves much of the relationship open to the board's interpretation.
At the hearing before the board panel, after the first Referee's decision, the board members pressed appellant's counsel for the actual value in money the coworkers received from total benefits supplied by the corporation. To this, counsel answered: "If we had to go out and hire people to do the same work we would probably have to pay double." The expressions "do the same work" and "pay double" strongly suggest employment.
The testimony of George Kahmar, one of the coworkers, received as typical of the relationship, strongly suggests an employment situation. In discussing with an officer of the corporation the matter of becoming a coworker, he testified he understood that "my needs would be taken care of".
This, he added, was "Not in payment", but it is arguable at least that an arrangement "as compensation" to take care of a man's "needs" would be quite adequate for many people and hundreds of thousands of workers in industrial employment do not get, or expect, as much.
*212 Mary Ellenquist, another coworker, testified that "in exchange" for taking care of seven villagers she was given room and board for her husband and family, free medical care, clothing for herself and her family and money she might want to have for shopping and entertainment.
This kind of arrangement on such facts does not have to be equated as a matter of law to a "volunteer" as that term is commonly understood.
It is instructive to know that other public agencies than the Workmen's Compensation Board are not entirely satisfied of an absence of the employment relation between the corporation and its coworkers. The Internal Revenue Service made inquiries concerned with tax withholding and taxability and, although an officer testified, "we explained the circumstances", nevertheless, "we have [had] a very great deal of difficulties in these matters". As of the time of this testimony, August 24, 1964, a decision had apparently not been made on the subject of inquiry on "the status of our people", and how they were "paid".
Although, undoubtedly, the motivation of dedicated service is very high both as to the corporation and the coworkers, this motivation does not alone, as the majority opinion notes, necessarily negative an employment relation within the terms of the statute, i.e., "low wages or humane motivations" would not necessarily change employment "into a voluntary arrangement".
When the statutory definition of wages is seen as including, broadly and specifically, the "reasonable value of board, rent, housing, lodging, or similar advantage" (Workmen's Compensation Law, § 201, subd. 12), it is clear that what this corporation gives and the coworkers receive in total maintenance is "wages", perhaps as a matter of law but certainly as an open fact question.
Moreover, the corporation's financial operation leaves us no ground to hold that the people who help produce its income should be deprived of the protection of the Disability Benefits Law.
For the fiscal year ending September 30, 1963, the corporation's income from fees paid for the wards cared for by the coworkers and from sales of goods, produced by and under *213 supervision of the coworkers, and contributions amounted to $77,000, of which $35,290 was expended to maintain 10 workers and their families and 19 wards.
The complex arrangement shown by this record, fairly arguable as to being or not being "employment", ought not by treating it as a "law" problem be definitively decided here against coverage.
Consistent with the beneficial social purpose of the statute, paralleling and extending the Workmen's Compensation Law itself, the court should read its definitions liberally. There seems no good policy ground, on a narrow reading of a beneficial statute, to overrule the Workmen's Compensation Board in this case.
The order should be affirmed.
Order reversed, etc.
NOTES
[1] "Perquisite" is defined as "A gain or profit incidentally made from employment" (Webster's New International Dictionary, 2d ed.).